UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tracy Lee Warner-Hall,

      Plaintiff,

    v.                                         Civil Action No. 2:14-cv-87-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

## OPINION AND ORDER
(Docs. 5, 12)

Plaintiff Tracy Warner-Hall brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for disability insurance benefits. Pending before the Court are Warner-Hall's motion to reverse the Commissioner's decision (Doc. 5), and the Commissioner's motion to affirm the same (Doc. 12). For the reasons stated below, Warner-Hall's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

Warner-Hall was 45 years old on her alleged disability onset date of March 16, 2011. She has completed high school and worked as a waitress/manager at her family's restaurant from approximately 1984 until March 2011. In 2010, she married her third husband, with whom she currently lives. She has two adult children.

Warner-Hall suffers from chronic pain, primarily due to osteoarthritis in the knees, hips, and cervical spine. In the years 2010 through 2012, she underwent left hip replacement

surgery and bilateral knee replacement surgeries. She also suffers from depression and high blood pressure. Warner-Hall testified that, on a typical day, she prepares simple meals, completes basic household chores including washing dishes and doing laundry, cares for her dogs, babysits her nephew including sometimes picking him up from school, uses a tanning bed in her home, and uses the computer (Facebook). She also occasionally shops for groceries, gardens, and attends family functions. She traveled to Ireland and California during the alleged disability period, but was limited in what she could see and do because of pain. (AR 41–43.) On these trips, she arranged for a wheelchair to meet her at the airport and used a cane to help with walking. (*Id.*) Warner-Hall testified that she becomes uncomfortable if she maintains any position for an extended period: she can sit for only 5–10 minutes at a time, stand for only 10–15 minutes at a time, and walk for only approximately 15–20 steps. (AR 42–43, 45.) She uses one or two crutches to assist with walking, and lies in bed with pillows and a heating pad approximately six times each day. (AR 43–45.) She takes Percocet for pain and trazodone for depression. (AR 39–40.) She testified that she cries a lot, sometimes does not want to get out of bed, and does not enjoy life anymore. (AR 39.)

In February 2011, Warner-Hall protectively filed an application for social security disability insurance benefits, alleging that, starting on March 16, 2011, she has been unable to work due to osteoarthritis of the knees, hips, back, and neck; depression; and anxiety. Warner-Hill's application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was held on November 13, 2012, by Administrative Law Judge (ALJ) Matthew Levin. (AR 34–50.) Warner-Hill appeared and testified, and was represented by a non-attorney representative. A vocational expert (VE)

also testified at the hearing.  On December 7, 2012, the ALJ issued a decision finding that Warner-Hall was not disabled under the Social Security Act from her alleged onset date of March 16, 2011 through the date of the decision.  (AR 19–29.)  Thereafter, the Appeals Council denied Warner-Hall's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 3–8.)  Having exhausted her administrative remedies, Warner-Hall filed the Complaint in this action on April 29, 2014.  (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC

3

precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Warner-Hall had not engaged in substantial gainful activity since her alleged onset date of March 16, 2011. (AR 21.) At step two, the ALJ found that Warner-Hall had the severe impairment of osteoarthritis of the knees, hips, and back. (*Id.*) Conversely, considering the "paragraph B" criteria, the ALJ found that Warner-Hall's depression and anxiety were non-severe. (AR 22–23.) At step three, the ALJ found that none of Warner-Hall's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 23–24.) Next, the ALJ determined that Warner-Hall had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except as follows:

> [Warner-Hall] can lift and carry ten pounds occasionally and ten pounds frequently with the ability to stand and [walk][1] for one hour in an eight-hour workday (thus sit the other 7). She can occasionally push and pull with her lower extremities. She can occasionally climb stairs, but must never climb ladders, ropes[,] or scaffolds. She can occasionally balance, stoop, kneel, crouch[,] and crawl.

---

[1] The ALJ's decision actually states "stand and *sit*" (AR 24 (emphasis added)), not "stand and *walk*," here. But given the context, this is a typographical error: the decision clearly finds that Warner-Hall was able to sit for seven hours, not just one hour, in an eight-hour workday. (*See id.*)

4

(AR 24.)  Given this RFC, the ALJ found that Warner-Hall was unable to perform her past relevant work as a restaurant manager.  (AR 27.)  Based on testimony from the VE, however, the ALJ determined that there were jobs existing in significant numbers in the national economy that Warner-Hall could perform, including the following representative sedentary occupations: telephone answering service operator, information clerk, and final assembler.  (AR 27–28.)  The ALJ concluded that Warner-Hall had not been under a disability from her alleged onset date through the date of the decision.  (AR 28–29.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964,

5

967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Warner-Hall contends the ALJ did not follow the treating physician rule in his analysis of the medical opinions, and failed to properly assess Warner-Hall's credibility. The Commissioner disagrees, arguing that the ALJ correctly analyzed the medical opinions and Warner-Hall's credibility, and that the ALJ's RFC determination accounts for Warner-Hall's subjective allegations and is supported by substantial evidence. For the following reasons, the Court finds in favor of the Commissioner.

**I.    The ALJ's analysis of the medical opinions was proper.**

**A.    Opinions of Treating Physician Dr. MacArthur**

Warner-Hall began treating with orthopedist Dr. Dougald MacArthur in March 2010. (AR 235–40.) Dr. MacArthur assessed Warner-Hall as having "[d]egenerative osteoarthritis overlying a dysplastic hip in a relatively young 44-year-old female [who] works on her feet continuously." (AR 237.) Initially, Dr. MacArthur recommended conservative care, including anti-inflammatory medication, weight loss, and exercise. (*Id.*) A few months later, however, after conservative measures failed and Warner-Hall's symptoms worsened, Dr. MacArthur scheduled Warner-Hall for a left total hip arthroplasty which was done in June

2010.  (AR 241–43, 245–47.)  In August 2010, Dr. MacArthur recorded in a treatment note that Warner-Hall was "[p]rogressing very well" after the surgery, although she still needed pain medication.  (AR 248.)  In January 2011, Dr. MacArthur noted that Warner-Hall's left hip was "stable and improving" (AR 255), but she was having pain in her left knee, exacerbated by ambulating while waitressing (AR 254).  After receiving several injections to the knee and reporting minimal improvement, in May 2011, Dr. MacArthur tentatively scheduled Warner-Hall for a left total knee arthroplasty.  (AR 335.)  Approximately two weeks later, however, Dr. MacArthur found that an MRI of the knee "does not justify considering [total knee arthroplasty] at th[is] point."  (AR 336.)  Nonetheless, a few months later, in September 2011, Warner-Hall underwent left total knee arthroplasty, at the recommendation of family nurse practitioner Carey Brodzinski.  (AR 356, 385–87.)

      After the left knee surgery, Warner-Hall followed up with Dr. MacArthur, who noted in November 2011 that Warner-Hall was "doing quite well," despite requiring "a lot of pain medicine."  (AR 421.)  Dr. MacArthur stated that Warner-Hall was ambulating unassisted "with only a mildly antalgic gait" (*id.*), and that she "needs to be more aggressive with range of motion" (AR 422).  About a month later, in December 2011, another provider in Dr. MacArthur's office, nurse practitioner Holly Blodgett, recorded in a treatment note that Warner-Hall advised that her left knee was "doing quite well," but now her right knee "has become increasingly bothersome."  (AR 426.)  Nurse Blodgett discussed with Warner-Hall MRI results which, according to the Nurse, "d[id] not show any significant arthritic changes."  (AR 427.)  Nurse Blodgett recommended against surgery, stating: "to go forward with total knee arthroplasty would be very drastic given that radiographic evidence is inconclusive."  (*Id.*)  But Warner-Hall was not agreeable to conservative treatment measures

7

Case 2:14-cv-00087-jmc   Document 13   Filed 06/23/15   Page 8 of 16

including injections and physical therapy, and ultimately, Dr. MacArthur suggested knee arthroscopy as the first treatment option, and Warner-Hall agreed.  (*Id.*)

In February 2012, therefore, Warner-Hall underwent a right total knee arthroplasty.  (AR 542.)  The next month, Nurse Blodgett saw Warner-Hall in follow-up and encouraged her to "be aggressive with her physical therapy."  (AR 441.)  In May 2012, Dr. MacArthur noted that Warner-Hall was "doing well except she has not gone to formal physical therapy" due to cost issues.  (AR 406.)  After examining Warner-Hall, Dr. MacArthur recorded that she had full extension "which is wonderful" and "[g]ood ligamentous stability," was "neurovascularly intact distally," and complained of no instability.  (*Id.*)  Dr. MacArthur further recorded that Warner-Hall had traveled to California and did "reasonably well" on the trip, despite using a wheelchair intermittently.  (*Id.*)  Dr. MacArthur instructed Warner-Hall in exercises, given her refusal to do physical therapy.  (*Id.*)

In July 2012, Dr. MacArthur wrote a letter in support of Warner-Hall's disability application.  (AR 542–43.)  Therein, Dr. MacArthur stated that Warner-Hall's diagnosis is "diffuse degenerative osteoarthritis affecting multiple joints status post [three] major joint replacements," and that the medical basis for this diagnosis is "multiple imaging studies including x-ray, MRI[,] and arthroscopic photography."  (AR 542.)  Dr. MacArthur further stated that, although Warner-Hall "ambulates well at this point," she has "fairly extensive" limitations on her activities.  (*Id.*)  Dr. MacArthur opined that, although the prognosis for Warner-Hall's knees and hips is "excellent," her right knee may require revision surgery at some point and the prognosis for her spine is "less optimistic."  (AR 543.)  Dr. MacArthur concluded as follows: "Within a reasonable degree of medical certainty, I do not think

[Warner-Hall] is capable of full[-]time work.  Because of her medical and orthopedic comorbidities[,] I would anticipate her disability to last beyond the next 12 months." (*Id.*)

Also in July 2012, Dr. MacArthur completed a "Lower Extremities Impairment Questionnaire." (AR 545–52.) Therein, he opined that, starting in June 2010, Warner-Hall's prognosis has been "poor," and that she is able to independently initiate ambulation but unable to sustain ambulation or complete activities. (AR 545–47.) Dr. MacArthur stated that, in an eight-hour workday, Warner-Hall can sit for only two hours and stand/walk for only one hour or less. (AR 548.) Dr. MacArthur further stated that Warner-Hall can lift and carry only up to five pounds occasionally; can perform no pushing, pulling, kneeling, bending, and stooping; and must avoid heights. (AR 549, 551.) Explaining that Warner-Hall's arthritis causes her constant pain resulting in depression, Dr. MacArthur opined that Warner-Hall's symptoms are severe enough to interfere with her attention and concentration frequently, and leave her incapable of even low-stress work. (AR 550.) Dr. MacArthur concluded that Warner-Hall's impairments would likely cause her to miss work more than three times per month. (AR 551.)

Under the "treating physician rule," the opinions of a treating physician such as Dr. MacArthur are afforded "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial [record] evidence." 20 C.F.R. § 404.1527(c)(2). Even when a treating physician's opinions are not given controlling weight, the opinions are still entitled to some weight, given that this physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

9

medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* The deference given to a treating physician's opinions may be reduced, however, upon consideration of several factors, including the length and nature of the treating physician's relationship with the claimant, whether the physician is a specialist, *the extent to which the medical evidence supports the physician's opinions*, *the consistency of the opinions with the rest of the medical record*, and any other factors which tend to contradict the opinions. *Id.* at (c)(2)–(6) (emphasis added); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). When controlling weight is not afforded to a treating physician's opinions, the ALJ's decision must contain "specific reasons" for the weight given to the opinions, supported by the evidence in the case record; and the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating [physician's] medical opinion[s] and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998) (where an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so).

Here, the ALJ relied on two regulatory factors—supportability and consistency with the record—in deciding to afford "[l]ittle weight" to Dr. MacArthur's opinions. (AR 27.) The ALJ explained that Dr. MacArthur's opinions are not supported by the objective medical evidence, the Doctor's own treatment notes, or Warner-Hall's reported daily activities. (*Id.*) As stated above, these were proper factors to consider in assessing the weight of Dr. MacArthur's opinions. *See* 20 C.F.R. § 404.1527(c)(3)–(4). Moreover, the ALJ's findings are supported by substantial evidence. For example, Dr. MacArthur's restrictive opinions that Warner-Hall could lift only five pounds occasionally; sit for only two hours in an eight-

10

hour workday; stand/walk for only one hour in an eight-hour workday; and never push, pull, kneel, bend, or stoop (AR 548–51), are inconsistent with Dr. MacArthur's own treatment notes which indicate that he encouraged Warner-Hall to exercise and be more aggressive with physical therapy and range of motion exercises (*see, e.g.*, AR 406, 422, 441). Dr. MacArthur's treatment notes state that Warner-Hall was in fact engaging in aerobic activities—including using a treadmill, riding a recumbent bike, and attending pool therapy—which are inconsistent with his opinions regarding Warner-Hall's significant functional limitations. (*See, e.g.*, AR 354, 360, 406, 426.) Furthermore, Warner-Hall herself reported that she was able to engage in activities precluded by Dr. MacArthur's severe physical limitations, including lifting a gallon of milk, cleaning and doing other housework, preparing simple meals, exercising, and gardening. (AR 42, 194–95, 197, 211–12, 214.) The record also reveals that Warner-Hall was able to take flights to California and Ireland, inconsistent with Dr. MacArthur's opinion that she could sit for only two hours in an eight-hour period. (AR 41–43, 360, 406.) Finally, as summarized above, Dr. MacArthur's treatment notes document that Warner-Hall was doing well after each of her surgeries, despite continuing to require pain medications. (AR 248, 255, 406, 421.)

### B.    Opinions of Agency Consultants

Dr. MacArthur's opinions are also inconsistent with the opinions of agency consultants Dr. Patricia Pisanelli, Dr. Leslie Abramson, and Dr. Alice Rogado. These consultants opined that Warner-Hall could lift twenty pounds occasionally and ten pounds frequently, sit for six hours in an eight-hour workday, and stand/walk for three-to-four hours in an eight-hour workday. (AR 56–57, 68–69, 315–16.) Although the ALJ's RFC determination is more restrictive than the agency consultant opinions (allowing for lifting

and carrying only ten pounds and standing/walking for only one hour) (AR 24), the ALJ gave "controlling weight" to the agency consultant opinions. (AR 27.)

The Court finds no error in the ALJ's allocation of significant weight to the agency consultant opinions and little weight to those of Dr. MacArthur. The regulations clearly permit the opinions of agency consultants to override those of treating physicians, when the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). Here, the opinions of the agency consultants are more consistent with the record than those of treating physician Dr. MacArthur. As the ALJ noted (AR 25–26), and as Dr. MacArthur recognized in treatment notes (see above), Warner-Hall showed continuous improvement during the relevant period, particularly after her surgeries, being able to exercise on a treadmill and a recumbent bike and taking vacations requiring lengthy flights. (*See* AR 41–43, 355, 360, 365, 406, 422, 426, 441.) The record even indicates that, in June 2012, Warner-Hall was able to "clear[] land at [a] campground that she [was] run[ning]."[2] (AR 447.)

---

[2] Warner-Hall states in her brief that "a review of the record cited by the ALJ fails to confirm this finding," and suggests that the ALJ "may have confused this case with a different claim." (Doc. 6 at 18.) But in fact, the record does contain a progress note which states: "[Warner–Hall] has been clearing land at [a] campground that she runs." (AR 447.) The note documents a June 2012 phone call from Warner-Hall to Loretta Nelson, LLN regarding a poison ivy rash that Warner-Hall had apparently developed while clearing land. (*Id.*)

Thus, the ALJ acted within his discretion in weighing the agency consultant opinions more heavily than those of Dr. MacArthur, and his decision to do so is supported by substantial evidence.

**II.     Substantial evidence supports the ALJ's assessment of Plaintiff's credibility.**

The ALJ also acted within his discretion in assessing Warner-Hall's credibility, and the ALJ's assessment that Warner-Hall's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not credible to the extent they are inconsistent with the [RFC determination]" (AR 25), is supported by substantial evidence.

It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  An important indicator of the credibility of a claimant's statements is their consistency with other information in the record, including the claimant's medical treatment history.  *Id.* at *5, *7.

Here, the ALJ specifically relied on medical records which indicated that Warner-Hall did well after each of her surgeries (*see* AR 25–26), and made the following specific findings explaining his negative assessment of Warner-Hall's credibility: (1) "[d]espite her pain, during a July 2011 medical appointment, [Warner-Hall] reported that she had just traveled to

13

Ireland with her husband" (AR 25) (*see* AR 360, 411); (2) "[w]hile [Warner-Hall] testifies that she is unable to exercise and is physically limited by pain, an August 2011 preoperative history assessment indicated that [she] was babysitting her nephew, gardening[,] and tanning regularly at her home," and "performing regular aerobic exercise on the treadmill and recumbent bike" (AR 25) (*see* AR 406, 418, 426); (3) "[d]espite her claim of total disability, [Warner-Hall] reported that she had been clearing land at a campground that she was running, which was consistent with a blister on her finger" (AR 26) (*see* AR 447); and (4) "[w]hile [Warner-Hall] testifies she uses a crutch for assisted ambulation, the medical record notes she does not need a cane" (AR 26) (*see* AR 548).  Additionally, the ALJ noted that, "[w]hile [Warner-Hall] alleges her employment ended due to her impairments, March 2011 treatment notes contain a different explanation for the termination of her employment."  (AR 26.)  The March 2011 treatment note reveals that Warner-Hall was experiencing "a lot of stress at work" and "a lot of conflict with the new owner" of her family's recently sold restaurant.  (AR 280.)  The note states: "Yesterday [Warner-Hall] 'blew up' at [the new owner] and has left; not planning to return."  (*Id.*; *see also* AR 184 (social security employee noting that Warner-Hall stated: she was "very agitated about the fact [that] her family restaurant was sold in 12/2010"; she experienced "verbal and emotional abuse" from the new owner; and she "quit/was fired" from her job at the restaurant on March 13, 2011), AR 187 (Warner-Hall stating in disability form that she stopped working "[b]ecause of my condition(s) and other reasons," including because "[I] was emotionally and verbally abused by the new owner of the res[ta]urant my family has owned my whole life"), AR 201 (Warner-Hall stating in Questionnaire that her reason for leaving employment at Warner's Gallery Restaurant was "verbal and emotional abuse from [the] new owner," and indicating

14

that a complaint was filed with the state's attorney and unemployment services).)  The ALJ reasonably found that "[Warner-Hall's] inconsistent statements raise a question as to whether [her] testimony is, in fact, reliable."  (AR 26.)

Considering Warner-Hall's activities and medical improvement during the relevant period, the ALJ concluded as follows:

> [Warner-Hall] testifies that she performs light cooking, she shops[,] and [she] drives.  She has traveled to Ireland and California.  The record notes that she babysits her nephew, gardens[,] and performs regular aerobic exercise on the treadmill and recumbent bike.  Given the good results from her surgeries and pain medication as well as her level of functioning, I find her limitations are overstated.

(AR 26–27 (citations omitted); *see also* AR 22 (ALJ listing Warner-Hall's "activities of daily living" and "social functioning" as part of "paragraph B" criteria analysis).)  This assessment is supported by the record, as discussed above, which demonstrates that, during the alleged disability period, Warner-Hall's activities included shopping, cleaning, driving, gardening, caring for a pet, babysitting her nephew, washing laundry, going on two vacations requiring lengthy flights, using a treadmill, riding a recumbent bike, attending pool therapy, and clearing land at a campground.  (AR 41–43, 194–99, 210–16, 354–55, 360, 365, 406, 422, 426, 441, 447.)  Warner-Hall argues that her "ability to engage in sporadic activities of daily living for short periods of time and with help from others" is not evidence that she can do full-time work.  (Doc. 6 at 18.)  But the ALJ was not obligated to accept Warner-Hall's allegations of pain and characterization of the record without question; he was entitled to exercise discretion in assessing Warner-Hall's credibility in light of the record as a whole. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Given that the ALJ's credibility assessment is supported by substantial evidence, and the credibility findings of an ALJ are

15

"entitled to great deference and therefore can be reversed only if they are patently unreasonable[,]" the Court does not disturb the ALJ's credibility assessment of Warner-Hall. *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).

## **Conclusion**

For these reasons, the Court DENIES Warner-Hall's motion (Doc. 5), GRANTS the Commissioner's motion (Doc. 12), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 23rd day of June, 2015.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge
